COURT OF APPEALS
DECISION
DATED AND FILED

March 11, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2224-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2017CF317**

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

　　PLAINTIFF-RESPONDENT,

V.

KEITH JAMES ROSE,

　　DEFENDANT-APPELLANT.

　　　　APPEAL from a judgment and an order of the circuit court for Rock County: JOHN M. WOOD, Judge. *Affirmed*.

　　　　Before Blanchard, Kloppenburg, and Nashold, JJ.

　　　　**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Keith Rose appeals a judgment of conviction for manufacturing methamphetamine and four other drug offenses, all as party to a crime. He also appeals the circuit court's order denying his motion for postconviction relief. A jury found Rose guilty based in part upon evidence that Rose was a regular methamphetamine user and that the basement where he lived with his sister contained materials used to make methamphetamine. Rose argues that the circuit court erroneously exercised its discretion by allowing law enforcement officers to provide opinion testimony that a methamphetamine user would recognize the materials used to make methamphetamine. We reject this argument and conclude that the circuit court reasonably admitted the testimony. Rose also argues that the circuit court violated his right to present a defense by refusing to admit certain evidence relating to his sister. We conclude that, even if the circuit court erred in refusing to admit the evidence, the error was harmless. Accordingly, we affirm.

## BACKGROUND

¶2 Law enforcement officers executed a search warrant at the home where Rose and his sister lived in the basement. Officers obtained the warrant after learning, among other information, that both Rose and his sister had been blocked from purchasing Sudafed because they had exceeded allowable purchase limits.[1] Officers had also received a tip that Rose's sister was making methamphetamine. Additionally, the officers had found incriminating items in trash picked up outside the home where Rose and his sister were living in the basement. These items

---

[1] Testimony by a law enforcement officer established that pseudoephedrine (sometimes sold in the product called Sudafed) is a key ingredient used in making methamphetamine.

included empty Sudafed packs, straws containing residue consistent with methamphetamine, and coffee filters containing methamphetamine residue.

¶3    As law enforcement officers entered Rose's residence to execute the search warrant, an officer saw Rose exiting the basement. In their search of the basement, the officers found numerous materials consistent with the "one pot" method for manufacturing methamphetamine. These materials included fish tank tubing, a high-acid drain cleaner, camp fuel and a canister of lighter fluid, pipe cutters that can be used to cut open lithium batteries to strip out lithium, a funnel, and grinders that can be used to grind up Sudafed. Additionally, the officers found plastic bottles with holes drilled through the top and plastic tubing running through the bottles. They also found "cold pack" containers and coffee filters with residue on them.

¶4    A federal drug enforcement officer testified that the materials found in the basement showed that the basement was being used to manufacture methamphetamine. A second officer testified that a long-time methamphetamine user "should" recognize the materials used to make methamphetamine. A third officer testified that he would find it "very hard … to believe" that anyone who was "familiar with meth, been around meth" would not recognize the materials in Rose's basement as those used in the making of methamphetamine. Rose objected to the testimony of the second and third officers.

¶5    Rose admitted during an interview with law enforcement that he had been using methamphetamine over a two-year period and that he used it regularly with his sister. He also admitted to purchasing Sudafed, and to asking a store employee whether someone else could purchase Sudafed for him when he reached his purchase limit. Additionally, Rose admitted that he had cleaned up

3

methamphetamine waste in the basement. He denied that he had ever manufactured methamphetamine. He stated that he was unsure of who made methamphetamine, although he had heard rumors that his sister did.

¶6     Rose's sister admitted during an interview with law enforcement that she had purchased Sudafed for Rose and his girlfriend, and that she suspected Rose was making methamphetamine. She also said that she had noticed a heavy chemical smell in the basement in the past, and when she asked Rose about the smell, he would say he was cleaning his tools or give some other excuse.

¶7     When Rose's sister later testified at trial, she claimed not to remember her interview because she had taken so much methamphetamine. She denied that she ever made methamphetamine, and also denied ever seeing Rose make methamphetamine. She admitted that she and Rose lived in the basement together and used methamphetamine together on a daily basis. She testified that Rose would buy Sudafed for her, and that she would give him methamphetamine. She admitted that she had been blocked from purchasing Sudafed or pseudoephedrine numerous times. Additionally, she admitted that she had purchased camping fuel for Rose. She also admitted that there were plastic bottles in the basement for the purpose of making methamphetamine. Finally, she admitted that Rose had shown her how much pressure to use to cut open a battery.

¶8     The jury found Rose guilty of each of the following offenses as party to a crime:   manufacturing methamphetamine, possession of waste from methamphetamine manufacturing, maintaining a drug trafficking place, possession of methamphetamine, and possession of drug paraphernalia.   We reference additional facts as needed in our discussion below.

**DISCUSSION**

¶9     We turn first to Rose's argument that the circuit court erroneously exercised its discretion by allowing law enforcement officers to provide opinion testimony that a methamphetamine user would recognize the materials used to make methamphetamine.   The significance of this testimony, as Rose seems to acknowledge, is that it tends to undercut any claim that Rose was an unwitting participant in the manufacture of methamphetamine in the basement where he lived. Because Rose was charged as party to a crime, the State did not need to prove that Rose personally made methamphetamine or directly committed each of the charged crimes; it was enough to show that Rose knowingly assisted another's commission of the crimes while "acting with knowledge or belief that [the] person is committing or intends to commit" them. *See* WIS JI—CRIMINAL 400; *see also **State v. Sharlow***, 110 Wis. 2d 226, 238-39, 327 N.W.2d 692 (1983).

¶10     "The admissibility of expert opinion testimony lies in the discretion of the circuit court." ***State v. St. George***, 2002 WI 50, ¶37, 252 Wis. 2d 499, 643 N.W.2d 777.  "The circuit court's exercise of discretion will not be overturned if the decision had 'a reasonable basis,' and if the decision was made 'in accordance with accepted legal standards and in accordance with the facts of record.'"  ***State v. LaCount***, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780 (quoted source omitted).     Circuit courts have "'considerable leeway' in determining the admissibility of expert testimony with the objective of ensuring the reliability and relevancy of such testimony in light of the facts of the particular case." *See **State v. Smith***, 2016 WI App 8, ¶7, 366 Wis. 2d 613, 874 N.W.2d 610 (2015) (quoting ***Kumho Tire Co., Ltd., v. Carmichael***, 526 U.S. 137, 152 (1999)).  "Reliability may be based on the expert's own observations from his or her 'extensive and specialized experience.'" ***Id.*** (quoting ***Kumho Tire***, 526 U.S. at 156).

5

¶11     Rose argues that the circuit court erroneously exercised its discretion under these standards when it allowed one law enforcement officer to testify that a long-time methamphetamine user "should" recognize the materials used to make methamphetamine, and another officer to testify that it was "very hard … to believe" that anyone who was "familiar with meth, been around meth" would not recognize the materials in Rose's basement as being used to make methamphetamine.  Rose argues that the officers were not qualified to provide this opinion testimony.  The State, in contrast, argues that the officers were qualified to provide this testimony.[2]

¶12     We uphold the circuit court's decision to allow the testimony because we conclude that the record shows there was a reasonable basis to conclude that the officers were qualified to provide it.  One officer stated that he had been in law enforcement for close to thirteen years and was part of a special drug investigation

---

[2]  The officers' testimony reads more fully as follows:

[Officer 1]

Q.      Based on your training and experience is it likely for a long-time Methamphetamine user not to recognize the materials used in making Methamphetamine?

A.      He should know.

        ….

[Officer 2]

Q.      …. Based on your training and experience as you know dealing with meth laboratories, is it likely that a person who is a regular user of Methamphetamine would not have recognized what you saw in the basement as a one pot Methamphetamine lab?

        ….

A.      I would find it would be very hard for me to believe that anybody in that room that would be familiar with meth, been around meth, had a history, that they wouldn't know what that was being used for.  It's pretty clear in my eyes when that's being seen.

unit. Additionally, he was certified in testing procedures for various drugs, and he had training and experience on how methamphetamine affects individuals. The other officer stated that he had been a law enforcement officer for twenty-five years, and that he had training and experience in investigating methamphetamine labs. He had executed approximately twenty-five to thirty search warrants for such labs. Based on the officers' training and experience, the circuit court reasonably allowed their opinion testimony.

¶13     In arguing to the contrary, Rose relies on *State v. Dalton*, 98 Wis. 2d 725, 298 N.W.2d 398 (Ct. App. 1980). Rose's reliance on *Dalton* is misplaced. In *Dalton*, this court concluded that it was impermissible for a psychiatrist to provide an opinion on whether the defendant had intent to kill. *See id.* at 728-32. The court reasoned that such testimony would improperly invade the jury's role to evaluate the evidence and determine intent. *See id.* at 730-31. Here, in contrast, the officers did not purport to opine directly on whether Rose knowingly participated in manufacturing methamphetamine. Rather, they provided opinions as to whether someone who is a long-time methamphetamine user or otherwise familiar with the drug would recognize the materials used to make it. The ultimate question of whether Rose knowingly participated in manufacturing methamphetamine was left to the jury to decide based on its evaluation of all of the evidence.

¶14     We turn to Rose's argument that the circuit court's exclusion of certain evidence relating to his sister violated his right to present a defense. More specifically, Rose argues that the circuit court should have allowed evidence that his sister was the sole original target of the investigation that led to the search of the basement. Rose contends that this evidence would have rebutted other evidence

7

that created an inaccurate impression that he was an original target.[3]  Rose also argues that the circuit court should have allowed evidence of a Child Protective Services "raid" on their home a week earlier.  Rose contends that this evidence would have shown both (1) that there were no signs of methamphetamine manufacture at the time of the raid, and (2) that his sister had a motive to shift blame to Rose because she feared losing her children.  According to Rose, the evidence the circuit court refused to admit would have bolstered his defense that his sister was the guilty party.

¶15    The State counters that the circuit court reasonably excluded this evidence as irrelevant and that, even if it was relevant, its exclusion did not violate Rose's right to present a defense.  The State additionally contends that, even if the court erred in excluding the evidence, the error was harmless.  A violation of the right to present a defense is subject to harmless error analysis.  *State v. Kramer*, 2006 WI App 133, ¶26, 294 Wis. 2d 780, 720 N.W.2d 459.

¶16    Rose offers no reply to the State's harmless error argument.  Regardless, we agree with the State that, if there was error, it was harmless.  An error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Mayo*, 2007 WI 78, ¶47, 301 Wis. 2d 642, 734 N.W.2d 115 (quoted sources and internal quotation marks omitted).

¶17    The evidence overwhelmingly showed that Rose, at a minimum, was a knowing participant in manufacturing methamphetamine and the other crimes

---

[3]  After Rose filed his reply brief, the State filed a letter with this court requesting that we strike three sentences in its brief, to correct an inaccuracy relating to whether Rose was an original target.  We now grant the request.

charged, even if he did not directly commit each of those crimes and even if his sister was the principal actor. To summarize the evidence already set forth:

(1)    Rose and his sister lived together in the basement and regularly used methamphetamine together;

(2)    Rose had been using methamphetamine for at least two years;

(3)    Both Rose and his sister had been blocked from purchasing Sudafed, a key ingredient in making methamphetamine, because they had exceeded the allowable purchase limit;

(4)    Rose asked a store employee whether someone else could purchase Sudafed for him once he reached the legal limit;

(5)    Rose would buy Sudafed for his sister, and she would give him methamphetamine;

(6)    Rose's sister bought him camping fuel, one of the materials used in making methamphetamine;

(7)    When police executed the search warrant at Rose's home, they found that the basement contained numerous materials commonly used for manufacturing methamphetamine;

(8)    Rose was seen exiting the basement when the warrant was executed;

(9)    A long-time methamphetamine user or other individual familiar with methamphetamine would likely recognize the materials used to make methamphetamine;

9

(10)    Rose showed his sister how much pressure to use to cut open a battery, one of the materials used in making methamphetamine;

(11)    Rose's sister admitted that there were plastic bottles in the basement for the purpose of making methamphetamine; and

(12)    Rose admitted to cleaning up methamphetamine waste in the basement.

¶18    We are satisfied that it is clear beyond a reasonable doubt that, even if the circuit court had admitted the additional evidence relating to Rose's sister, a rational jury still would have found Rose guilty. Assuming without deciding that such evidence might have further incriminated Rose's sister to the benefit of Rose's defense, such as casting doubt on her motives for implicating Rose, it would not have materially changed the overall strength of the evidence pointing to Rose's guilt.

¶19    In sum, for the reasons stated above, we affirm the judgment of conviction and the order denying Rose's motion for postconviction relief.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2019-20).